**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MATTHEW SCIABACUCCHI, derivatively on behalf of XEROX CORPORATION, | : : : : |
| Plaintiff, | : : |
| v. | : : |
| URSULA M. BURNS, CHARLES O. PRINCE III, RICHARD J. HARRINGTON, ANN N. REESE, WILLIAM CURT HUNTER, SARA MARTINEZ TUCKER, ROBERT J. KEEGAN, MARY AGNES WILDEROTTER, STEPHEN H. RUSCKOWSKI, NICHOLAS J. NICHOLAS, JR.,  ROBERT A. MCDONALD, LYNN R. BLODGETT, LUCA MAESTRI, GARY R. KABURECK, JAMES A. FIRESTONE, KATHRYN A. MIKELLS, THOMAS W. BLODGETT, DAVID AMORIELL, MICHAEL R. FESTA, JOSEPH H. MANCINI, JR., and LESLIE F. VARON, | : : : : : : : : : : : : : : : : : |
| Defendants, | : : |
| and | : : |
| XEROX CORPORATION, | : : |
| Nominal Defendant. | : : |

Civil Action No.

**JURY TRIAL DEMANDED**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.      Plaintiff Matthew Sciabacucchi ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Xerox Corporation ("Xerox" or the "Company") against certain members of Xerox's Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2010 to the present (the "Relevant Period").

**NATURE OF THE ACTION**

2.     According to its public filings, Xerox, together with its subsidiaries, is the global leader in business process and document management solutions, helping organizations of any size become more efficient.  Headquartered in Norwalk, Connecticut, more than 140,000 Xerox employees serve clients in 160 countries, providing business services, printing equipment and software for commercial and government organizations.

3.     In February 2010, Xerox acquired Affiliated Computer Services, Inc. ("ACS") for $6.4 billion.    Based in Dallas, Texas, ACS provided information technology services as well as business process outsourcing solutions to businesses and government agencies.  ACS is now part of the Xerox Services business.

4.     On October 8, 2013, defendants caused the Company to file with the Securities and Exchange Commission ("SEC") a Form 8-K, disclosing that the SEC had been conducting an investigation of certain accounting practices at ACS.

5.     More specifically, the Form 8-K disclosed that the focus of the SEC's investigation was whether revenue associated with certain ACS equipment resale transactions, primarily in the period prior to Xerox's acquisition of ACS, should have been presented on a net rather than gross basis.  In addition, the Form 8-K announced that defendant Lynn R. Blodgett ("L. Blodgett"), Executive Vice President of Xerox and President of Xerox Services, and two other individuals, had received a "Wells notice" from the SEC in connection with the matters underlying the investigation.

6.     On August 28, 2014, the SEC issued an order stating that the SEC was instituting cease-and-desist proceedings against L. Blodgett and another individual, Kevin Kyser ("Kyser"), ACS's former Chief Financial Officer ("CFO").  In addition, the SEC order further stated that in

anticipation of these proceedings, L. Blodgett and Kyser submitted an Offer of Settlement, which the SEC accepted (the "SEC Settlement").[1]

7.     Throughout the Relevant Period, defendants made false and misleading statements related to the Company's revenue classification, failing to recognize and state the true impact on its financials of its acquisition of ACS. Specifically, as the SEC would later conclude, ACS arranged for an equipment manufacturer to re-direct certain of its pre-existing orders through ACS, which gave the appearance that ACS was involved. ACS, however, had no substantive involvement in the orders, and there were no changes to the terms of the pre-existing orders. Because of the nature of these arrangements, ACS should not have reported revenue from these arrangements and therefore misreported revenues in its financial reports.

8.     Further, during the Relevant Period, defendants: (i) breached their fiduciary duties of loyalty and good faith in connection with their management, operation and oversight of Xerox's and/or their subsidiaries' business, and in particular the accounting practices at ACS; (ii) breached their fiduciary duty of good faith to establish and maintain adequate internal controls; and (iii) breached their fiduciary duties by disseminating false, misleading and/or incomplete information, including information with respect to Xerox's acquisition of ACS and information contained within the Company's financial results filed with the SEC.

9.     Through due diligence at the time of the ACS acquisition, the Defendants should have discovered the accounting impropriety.  The misreported revenues in ACS' financial reports overstated the value of ACS and caused Xerox to pay an inflated price for ACS.

10.     Accordingly, the Company has been significantly damaged.

---

[1]     *See In the Matter of Lynn R. Blodgett and Kevin R. Kyser*, Securities Act Release No. 72938A; Administrative Proceeding File No. 3-16045 (August 28, 2014).

11.     In light of the foregoing events, on October 30, 2013, Plaintiff issued upon the Board a pre-suit shareholder demand pursuant to New York law (the "Demand") wherein Plaintiff requested that the Board conduct an investigation into the breaches of fiduciary duties alleged and commence an action against certain current and/or former directors and executive officers of the Company.  A true and correct copy of the Demand is attached hereto as Exhibit A.

12.     Thereafter, Plaintiff's counsel received a letter, dated November 19, 2013, from Don H. Liu ("Liu"), the Company's Executive Vice President, General Counsel and Secretary confirming that the Board received the Demand.  In addition, and without citing any provision of New York law, Mr. Liu's letter requested that Plaintiff provide "information and evidence concerning [his] ownership of Xerox stock, including the amount of stock he currently owns and the dates when he acquired such stock."  A true and correct copy of Mr. Liu's letter is attached hereto as Exhibit B.

13.     Six months later, Plaintiff's counsel received a letter, dated May 14, 2014, from Kenneth E. Lee ("Mr. Lee") of the law firm Levine Lee LLP ("Levine Lee") ("Mr. Lee's May 14 Letter").  Mr. Lee's May 14 Letter informed Plaintiff's counsel that the Board had purportedly created a Demand Review Committee (the "DRC") and had engaged Levine Lee as counsel to the DRC.  Mr. Lee's May 14 Letter also, and, again, without citing any provision of New York law, requested that Plaintiff provide proof of his Xerox stock ownership.  A true and correct copy of Mr. Lee's May 14 Letter is attached hereto as Exhibit C.

14.     Despite the fact that neither Mr. Liu's nor Mr. Lee's letter cited any New York or other authority in connection with the request for proof of Plaintiff's stock ownership, on June 11, 2014, Plaintiff's counsel nonetheless provided Mr. Lee with the requested account statement.  A

true and correct copy of Plaintiff's counsel's June 11, 2014 letter with accompanying account statement is attached hereto as Exhibit D.

15.     Thereafter, Plaintiff's counsel received a letter, dated June 13, 2014, from Mr. Lee ("Mr. Lee's June 13 Letter") stating that Plaintiff's stock ownership was insufficient under New York law to pursue a derivative action, reiterating defendants' request that Plaintiff's counsel provide them with sufficient documentation to establish Plaintiff's stock ownership during the Relevant Period.  A true and correct copy of Mr. Lee's letter is attached hereto as Exhibit E.

16.     Again, despite the fact that Mr. Lee's June 13 Letter relied on no New York or other authority to suggest such additional proof was required to support the Demand, on September 8, 2014, Plaintiff's counsel sent additional requested information to Mr. Lee.  A true and correct copy of Plaintiff's counsel's September 8, 2014 correspondence is attached hereto as Exhibit F.

17.      Following Mr. Lee's June 13, 2014 Letter, Plaintiff's counsel did not receive the results of the DRC's investigation until November 13, 2014.  That day, Plaintiff's counsel received a letter (the "Refusal") from Mr. Lee, which  stated that the Board had created the DRC, comprised of directors Charles O. Prince III ("Prince") and Ann N. Reese ("Reese"), which, based on its investigation, recommended, and the full Board agreed, to reject the Demand in its entirety.  A true and correct copy of the Refusal is attached as Exhibit G.

18.     Notably, the Refusal identified certain actions taken by the DRC in connection with its purported investigation, including expressly stating that it conducted interviews with employees and directors of the Company.  In so doing, the Refusal outlines a deficient and unreasonable DRC investigation, which obviates any deference it otherwise would be afforded.  Chiefly, among other things, the Refusal lacked any evidence that the DRC interviewed a single representative from the SEC which investigated the Company's accounting practices and found numerous violations,

giving rise to the allegations contained herein.  Specifically, the DRC failed to even contact SEC Commissioner Luis A. Aguilar ("Commissioner Aguilar"), the lone dissenting voice to the SEC Settlement, who would argue that the conduct was so egregious that the SEC should have pursued violations of the Securities Act.

19.     On December 12, 2014, Plaintiff's counsel wrote an additional letter to Mr. Lee, seeking specifics regarding the DRC's investigative process, including details surrounding the witnesses interviewed and documents reviewed.  The December 12, 2014 letter stated, in pertinent part:

> Please identify each of the "thirteen current and former directors, officers or employees of the Company and ACS" that the DRC and/or its counsel interviewed. Additionally, please identify each of the "various Xerox and ACS employees" whose interviews were conducted by the U.S. Securities and Exchange Commission (the "SEC"), and whose interview transcripts were reviewed by the DRC and/or its counsel, as well as each of the individuals that made the "Wells Submissions" that were reviewed by the DRC and/or its counsel. Further, please indicate whether the DRC and/or its counsel was unable to interview any witness(es) that it attempted to interview or obtain any SEC interview transcript(s) it sought to review, and if so, please identify such witness(es) and interview transcript(s). Finally, the Refusal does not indicate whether the DRC and/or its counsel ever interviewed any representative(s) of the SEC. Kindly confirm that the DRC and/or its counsel never conducted any such interview(s).

A true and correct copy of the December 12, 2014 letter from Plaintiff's counsel to Mr. Lee is attached hereto as Exhibit H.

20.     In response, Mr. Lee responded to Plaintiff's counsel on December 30, 2014 stating that Plaintiff's counsel's December 12, 2014 letter was referred to Mr. Liu.  A true and correct copy of Mr. Lee's December 30, 2014 letter is attached hereto as Exhibit I.

21.     Having heard nothing for six weeks, Plaintiff's counsel wrote to Mr. Liu on February 24, 2015, again, seeking clarification on the DRC's process and specifically stating, in relevant part:

> Having received no substantive response to my December 12 Letter, I presume that you and/or Levine Lee do not intend to respond to my requests for further information. I also presume that the DRC and/or its counsel was able to interview all witnesses that it intended to interview and obtained all SEC interview transcripts that it intended to review, and that the DRC and its counsel never intended to and did not interview any representative(s) of the SEC. If you would care to provide any further information or clarification, I suggest that you do so forthwith.

A true and correct copy of Plaintiff's counsel's February 24, 2015 letter to Mr. Liu is attached hereto as Exhibit J.

22.     Plaintiff's counsel's February 24, 2015 letter was also completely ignored.  Plaintiff still, sixth months later, has not received a response.

23.     The DRC's failure to engage the SEC, a critical party to the underlying cause of action, renders its investigation incomplete and supports the reasonable inference that its conclusions, and the defendants' subsequent endorsement of the same, were not reached in good faith.

24.     As a result, the Company has been harmed and the instant shareholder derivative action should be allowed to proceed.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

26.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District and Xerox maintains its

corporate headquarters in this District.  Further, defendants either reside in or maintain executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

28.   Plaintiff is a current shareholder of Xerox and has continuously held Xerox stock since December 2003.  Plaintiff is a citizen of Pennsylvania.

29.   Nominal defendant Xerox is a New York corporation with its headquarters located at 45 Glover Avenue, PO Box 4505, Norwalk, Connecticut 06856-4505.  According to its public filings, Xerox, together with its subsidiaries, is the global leader in business process and document management solutions, helping organizations of any size be more efficient so they can focus on their real business.

30.   Defendant Ursula M. Burns ("Burns") has served as a director of the Company since April 2007.  In addition, defendant Burns has served as the Chief Executive Officer ("CEO") of the Company since July 2009, and Chairman of the Board since May 2010.  Upon information and belief, defendant Burns is a citizen of Connecticut.

31.   Defendant Prince has served as a director of the Company since July 2008.  In addition, Prince is a member of the Company's Corporate Governance Committee ("Corporate Governance Committee") and Compensation Committee ("Compensation Committee").  Upon information and belief, defendant Prince is a citizen of Florida.

32.   Defendant Richard J. Harrington ("Harrington") has served as a director of the Company since 2004.  In addition, defendant Harrington is the Chairman of the Board's Audit Committee ("Audit Committee").  Upon information and belief, defendant Harrington is a citizen of Connecticut.

33.     Defendant Reese has served as a director of the Company since 2003.  In addition, defendant Reese is the Chairman of the Corporate Governance Committee, a member of the Board's Finance Committee ("Finance Committee"), and a member of the Board's Compensation Committee.  Upon information and belief, defendant Reese is a citizen of New York.

34.     Defendant William Curt Hunter ("Hunter") has served as a director of the Company since 2004.  In addition, defendant Hunter is a member of the Audit Committee and Finance Committee.  Upon information and belief, defendant Hunter is a citizen of Illinois or North Carolina.

35.     Defendant Sara Martinez Tucker ("Tucker") has served as a director of the Company since September 2011.  In addition, defendant Tucker is a member of the Finance Committee and Corporate Governance Committee.  Upon information and belief, defendant Tucker is a citizen of Texas.

36.     Defendant Robert J. Keegan ("Keegan") has served as a director of the Company since 2010.  In addition, Defendant Keegan is the Chairman of the Compensation Committee and a member of the Audit Committee.  Upon information and belief, defendant Keegan is a citizen of North Carolina.

37.     Defendant Mary Agnes Wilderotter ("Wilderotter") has served as a director of the Company since 2006.  In addition, defendant Wilderotter is the Chairman of the Finance Committee and a member of the Corporate Governance Committee.  Upon information and belief, defendant Wilderotter is a citizen of Connecticut.

38.     Defendant Stephen H. Rusckowski ("Rusckowski") has served as a director of the Company since 2015.  Upon information and belief, defendant Rusckowski is a citizen of Massachusetts.

39.     Defendant Nicholas J. Nicholas, Jr. ("Nicholas") served as a director of the Company from 1987 until 2012.  Prior to his departure, Nicholas was the Chairman of the Compensation Committee, served on the Finance Committee, and held the position as Lead Independent Director until May 2012.  Upon information and belief, defendant Nicholas is a citizen of New York.

40.     Defendant Robert A. McDonald ("McDonald") served as a member of the Board from 2005 until 2014.  In addition, McDonald served as a member of the Compensation Committee and Audit Committee during the Relevant Period.  McDonald is currently the United States Secretary of Veterans Affairs.  Upon information and belief, defendant McDonald is a citizen of Ohio.

41.     Defendant L. Blodgett served as the President of Xerox Services from January 2012 until he retired on December 31, 2014.  Despite his retirement, L. Blodgett remains a corporate Executive Vice President of the Company.  Prior to joining Xerox, L. Blodgett was president and CEO of ACS.  Upon information and belief, defendant L. Blodgett is a citizen of Utah.

42.     Defendant Luca Maestri ("Maestri") served as the Company's CFO and Executive Vice President from February 2011 until February 2013.  Upon information and belief, defendant Maestri is a citizen of Massachusetts or California.

43.     Defendant Gary R. Kabureck ("Kabureck") served as the Company's Chief Accounting Officer from August 1985 until March 2013.  Upon information and belief, defendant Kabureck is a citizen of New York.

44.     Defendant James A. Firestone ("Firestone") served as the Company's President of Corporate Operations from September 2008 until January 2014, during which he was responsible for a number of corporate functions, including the integration of ACS.  He was appointed an

Executive Vice President of the Company in April 2007.   Currently, Firestone is the President of Corporate Strategy and Asia Operations for Xerox.   Upon information and belief, defendant Firestone is a citizen of Connecticut.

45.     Defendant Kathryn A. Mikells ("Mikells") has served as the Company's Chief Financial Officer and Executive Vice President since May 2013.   Upon information and belief, defendant Mikells is a citizen of Connecticut and Florida.

46.     Defendant Thomas W. Blodgett ("T. Blodgett") served as a Vice President of the Company from February 2012 until December 2014.   In January 2015, T. Blodgett became the CEO for Latin America for Xerox Services.   Upon information and belief, defendant T. Blodgett is a citizen of Utah.

47.     Defendant David Amoriell ("Amoriell") served as a Corporate Vice President of the Company from February 2012 until May 2014.   Since June 2014, Amoriell has served as the CEO of the Public Sector Business Group for Xerox Services.   Upon information and belief, defendant Amoriell is a citizen of Maryland.

48.     Defendant Michael R. Festa ("Festa") has served as the CFO for Xerox Services since January 2012.   In addition, Festa was named a Corporate Vice President of the Company in October 2010.   Upon information and belief, defendant Festa is a citizen of Connecticut.

49.     Defendant Joseph H. Mancini, Jr. ("Mancini") has served as the Company's Chief Accounting Officer since April 2013.   In addition, Mancini was named a Corporate Vice President of the Company in October 2010.   Upon information and belief, defendant Mancini is a citizen of Connecticut.

50.     Defendant Leslie F. Varon ("Varon") has served as a Vice President of the Company since August 2001.   In addition, in February 2015, Varon was named Xerox's Vice

President of Investor Relations.  Upon information and belief, defendant Varon is a citizen of Connecticut.

51.     Collectively, defendants Burns, Prince, Harrington, Reese, Hunter, Tucker, Keegan, Wilderotter, Rusckowski, Nicholas, McDonald, L. Blodgett, Maestri, Kabureck, Firestone, Mikells, T. Blodgett, Amoriell, Festa, Mancini, and Varon shall be referred to herein as "Defendants."

52.     Collectively, defendants Harrington, Hunter, Keegan, and McDonald shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

53.     By reason of their positions as officers, directors, and/or fiduciaries of Xerox, and because of their ability to control the business and corporate affairs of Xerox, the Defendants owed Xerox and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Xerox in a fair, just, honest, and equitable manner.

54.     Further, the Defendants were and are required to act in furtherance of the best interests of Xerox and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Xerox and its shareholders the fiduciary duty to exercise good faith and due diligence in the administration of the affairs of the Company, and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

55.     Because of their positions of control and authority as directors and/or officers of Xerox, having knowledge of material non-public information regarding the Company, the Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts

complained of herein.  To discharge their duties, the officers and directors of Xerox were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Xerox were required to, among other things:

a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

56.  Further, pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

a.  Review and make recommendations to the Board concerning the Company's policies with regard to affiliate transactions which could have an impact on the Company's financial results or internal controls of financial reporting;

b.  Discuss with management and the Auditors the quality and adequacy of the Company's disclosure controls and procedures, and review disclosures made by the Company's principal executive officer and principal financial officer in the Company's periodic reports filed with the SEC regarding compliance with their certification obligations;

c.  Discuss with management and the Auditors (prior to each quarterly earnings release) the earnings press release, as well as financial information and earnings guidance to be provided to investors, analysts or rating agencies;

d.  Discuss with management the Company's policies with respect to the types of information and type of presentation to be used in earnings releases and in providing financial information and earnings guidance to the public;

e.  Meet to review and discuss with management and the Auditors the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing on Forms 10-Q;

    f.   Meet to review and discuss with management and the Auditors the annual audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," any changes in accounting policies and practices, financial reporting practices and significant reporting issues, critical accounting policies and significant estimates and judgments made in connection with the preparation of such audited financial statements, prior to filing on Forms 10-K;

    g.   Review with management and the Auditors the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements;

    h.   Review with, and make a recommendation to, the Board with respect to the inclusion of the audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", in the Company's Annual Report to Shareholders and in the Company's Form 10-K to be filed with the SEC;

    i.   Prepare the report from the Audit Committee required by the rules of the SEC to be included in the Company's annual proxy statement; and

    j.   Review with the Company's General Counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material reports or inquiries received from regulators or government agencies.

## SUBSTANTIVE ALLEGATIONS

### Background

57.    According to its public filings, Xerox, together with its subsidiaries, is the global leader in business process and document management solutions, helping organizations of any size be more efficient so they can focus on their real business.  Headquartered in Norwalk, Connecticut, more than 140,000 Xerox employees serve clients in 160 countries, providing business services, printing equipment and software for commercial and government organizations.

58.    In February 2010, Xerox acquired Affiliated Computer Services, Inc. ("ACS"). Based in Dallas, Texas, ACS provided information technology services as well as business process

outsourcing solutions to businesses and government agencies.  ACS is now part of the Xerox Services Business.

## **Defendants' False and Misleading Statements**

59.     Prior to October 8, 2013, Defendants regularly issued false and misleading statements regarding the Company's revenue classification, failing to recognize and state the true impact on its financials of its acquisition of ACS.

60.     On February 5, 2010, Defendants issued a press release entitled "Shareholders Approve Xerox Acquisition of Affiliated Computer Services."  The press release set forth, in relevant part:

> Shareholders of Xerox Corporation (NYSE: XRX) and of Affiliated Computer Services, Inc. (NYSE: ACS) today approved Xerox's acquisition of ACS. The transaction will be completed shortly, transforming Xerox into the leading global enterprise for business process and document management, and accelerating its growth in an expanding market.
>
> More than 96 percent of the Xerox common shares that voted at the Xerox meeting voted "FOR" the acquisition.
>
> More than 86 percent of the voting power of the outstanding shares of ACS Class A and Class B stock voted "FOR" the acquisition. In addition, the "majority of the minority" vote requirement was met.
>
> "Our shareholders' vote of confidence reflects the strategic and financial benefits of this acquisition," said Ursula M. Burns, Xerox chief executive officer.  "Through the acquisition of ACS, Xerox gains a growth catalyst that secures a strong, competitive future for our company and increasing value for our customers and shareholders."
>
> The world's largest diversified business process outsourcing firm, ACS is a $6.5 billion company with revenue growth of 6 percent and new business signings of $1 billion in annual recurring revenue during its fiscal 2009.
>
> "By endorsing this acquisition, ACS shareholders have shown that the time is right to bring our business to the next level of global expansion," said Lynn Blodgett, president and chief executive officer of ACS. "Xerox gives us the brand recognition, global scale and innovation to strengthen our industry leadership. We'll now be able to create more opportunities for our clients to simplify the way they conduct their business."

61.     On January 26, 2011, Defendants issued a press release entitled "Xerox Reports Fourth-Quarter 2010 Earnings."  The press release set forth, in relevant part:

Xerox Corporation (NYSE: XRX) announced today fourth-quarter 2010 results that include adjusted earnings per share of 29 cents and $1.3 billion in operating cash flow. Adjusted EPS excludes 17 cents primarily related to restructuring charges and amortization of intangibles, resulting in GAAP EPS of 12 cents.

"We started 2010 with the acquisition of Affiliated Computer Services, which transformed our company into the world's leading enterprise for business process and document management. And, we closed the year with results that reflect the benefits of our expanded services and competitive technology as well as the strength of our business model," said Ursula Burns, Xerox chairman and chief executive officer. "In 2010, we grew adjusted earnings, increased revenue and generated $2.7 billion in operating cash – delivering across the board on our commitments and creating greater value for shareholders."

Fourth-quarter revenue of nearly $6 billion was up 42 percent including a one point negative impact from currency. ***On a pro-forma basis, with ACS in the company's results, total revenue grew 2 percent or 3 percent in constant currency***. Revenue from technology, representing the sale of document systems, supplies, technical service and financing of products, was flat or up one percent in constant currency. Total install activity for Xerox equipment was up 6 percent, reflecting solid demand across all product segments. ***Revenue from services was up 5 percent on a pro-forma basis or 6 percent in constant currency, and represents the company's business process, IT and document outsourcing offerings.***

\* \* \*

The $1.3 billion in operating cash flow in the fourth quarter contributed to $2.7 billion in cash flow for the full year. From the time of the ACS acquisition in February 2010, Xerox reduced total debt by $1.9 billion to $8.6 billion. Xerox ended the year with a cash balance of $1.2 billion.

The company's full-year 2010 net income was $606 million. ***Total revenue was $21.6 billion, up from $15.2 billion in 2009.***

\* \* \*

**Pro-forma Basis**

To better understand the trends in our business, we discuss our 2010 operating results by comparing them against adjusted 2009 results which include ACS historical results for the comparable period.  Accordingly, we have included ACS's 2009 estimated results for the comparable period, October 1st through December 31st, in our reported 2009 results.  We refer to comparisons against these adjusted 2009 results as "pro-forma" basis comparisons.  ACS 2009 historical results have been adjusted to reflect fair value adjustments related to property, equipment and

- 16 -

computer software as well as customer contract costs.  In addition, adjustments were made for deferred revenue, exited businesses and other material non-recurring costs associated with the acquisition.  We believe comparisons on a pro-forma basis are more meaningful than the actual comparisons given the size and nature of the ACS acquisition.  ***We believe the pro-forma basis comparisons allow investors to have a better understanding and additional perspective of the expected trends in our business as well as the impact of the ACS acquisition on the Company's operations.***

62.     On February 23, 2011, Defendants caused Xerox to file with the SEC an Annual Report on Form 10-K (the "2010 10-K").  The 2010 10-K was signed by Burns, Maestri, Kabureck, Harrington, Hunter, Keegan, McDonald, Nicholas, Prince, Reese, Wilderotter, and former director Glenn A. Britt ("Britt") and (among other things) reiterated the financial results announced in the January 26, 2011 press release.  In addition, the 2010 10-K contained a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Burns and Maestri, which set forth:

I, [Ursula M. Burns/Luca Maestri], certify that:

1. I have reviewed this Annual Report on Form 10-K of Xerox Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

In connection with the Form 10-K of Xerox Corporation, a New York corporation (the "Company"), for the year ending December 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Ursula M. Burns, Chairman of the Board and Chief Executive Officer of the Company, and Luca Maestri, Executive Vice President and Chief Financial Officer of the Company, each hereby certifies, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, to the best of his/her knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

63.     On January 25, 2012, Defendants caused the Company to issue a press release entitled "Xerox Reports Fourth-Quarter 2011 Earnings."  The press release set forth, in relevant part:

- Full-year 2011 GAAP EPS of 90 cents; adjusted EPS of $1.08, up 15 percent

* * *

The company ended 2011 with full-year adjusted EPS up 15 percent, pro-forma revenue up 2 percent and operating cash flow of $2 billion. "Our performance reflects Xerox's operational discipline in delivering strong bottom-line results while scaling our services business and maintaining our leadership in document technology," said Ursula Burns, Xerox chairman and chief executive officer.

* * *

Full-year 2011 results include:
- Net income of $1.3 billion, adjusted net income of $1.6 billion, up 21 percent
- Total revenue of $22.6 billion, up 5 percent, 2 percent pro-forma
- Operating margin of 9.8 percent, up 0.3 points pro-forma
- Operating cash flow of $2 billion
- $700 million in share repurchase

64.     On February 23, 2012, the Defendants caused the Company to file with the SEC an Annual Report on Form 10-K (the "2011 10-K").  The 2011 10-K was signed by Burns, Maestri, Kabureck, Britt, Harrington, Hunter, Keegan, McDonald, Nicholas, Prince, Reese, Tucker and Wilderotter, and (among other things) reiterated the financial results announced on January 25, 2012.  In addition, the 2011 10-K contained SOX certifications signed by Burns and Maestri, which were substantially similar to those set forth in ¶62.

65.     On January 24, 2013, Defendants caused the Company to issue a press release entitled "Xerox Reports Fourth-Quarter Earnings."  The press release set forth, in relevant part:

**Full-year 2012 results include:**
- GAAP earnings per share of 88 cents per share; adjusted earnings per share of $1.03.
- Total revenue of $22.4 billion, down 1 percent or flat in constant currency from full-year 2011. ***Total services revenue of $11.5 billion, up 6 percent or up 7 percent in constant currency.*** Total document technology revenue of $9.5 billion, down 8 percent or down 6 percent in constant currency.

- 19 -

- Operating margin of 9.3 percent, down 0.5 points from full-year 2011.
- Operating cash flow of $2.6 billion, up $600 million from full-year 2011.
- Net income of $1.2 billion, adjusted net income of $1.4 billion, down 11 percent.

66.     On February 21, 2013, Defendants caused the Company to file with the SEC an annual report on Form 10-K (the "2012 10-K"). The 2012 10-K was signed by Burns, Maestri, Kabureck, Britt, Harrington, Hunter, Keegan, McDonald, Prince, Reese, Tucker and Wilderotter, and (among other things) reiterated the financial results announced on January 24, 2013. In addition, the 2012 10-K contained SOX certifications signed by Burns and Maestri, which were substantially similar to those set forth above.

### The Truth Begins To Emerge

67.     On October 8, 2013, Defendants filed with the SEC a Form 8-K. Therein, Defendants revealed, in relevant part, the following:

> **The Securities and Exchange Commission ("SEC") has been conducting an investigation of certain accounting practices at Affiliated Computer Services, Inc. ("ACS"), which was acquired by Xerox in February 2010 and is now part of Xerox's Services business. The investigation is focused on whether revenue associated with certain ACS equipment resale transactions with several customers should have been presented on a net rather than gross basis, primarily in periods prior to the acquisition. The transactions were not material to Xerox's post-acquisition consolidated financial statements.** Neither ACS's nor Xerox's net income or cash flow associated with these transactions would have been affected by the change in accounting from gross to net revenue recognition. Xerox has cooperated, and will continue to cooperate, fully with the SEC. The SEC staff has advised that it will not recommend charges against Xerox.
>
> **Xerox has been informed by Lynn R. Blodgett, Executive Vice President of Xerox and President, Xerox Services, that he has received a "Wells notice" from the SEC staff in connection with the matters underlying the investigation. Xerox understands that two other individuals, one a current employee and one a former employee, also have received Wells notices in connection with these matters. A Wells notice is not a formal allegation or a finding of wrongdoing; it is an indication that the staff is considering recommending that the SEC bring civil enforcement actions against these three individuals.** Under the SEC's procedures, a recipient of a Wells notice has an opportunity to respond in the form of a submission that seeks to persuade the SEC that such an action should not be brought.

All three individuals have advised Xerox that they intend to make such submissions. [Emphasis added.]

68.     On August 28, 2014, the SEC issued an order stating that the SEC was instituting cease-and-desist proceedings against L. Blodgett and another individual, Kyser, ACS's former CFO (the "Order"). In addition, the Order further stated that in anticipation of these proceedings, L. Blodgett and Kyser had submitted an Offer of Settlement, which the SEC accepted.

69.     The Order found that:

At or near the end of each quarter ended September 30, 2008 through the quarter ended June 30, 2009, *Affiliated Computer Services, Inc. ("ACS") arranged for an equipment manufacturer to re-direct certain of its pre-existing orders through ACS, which gave the appearance that ACS was involved. ACS, however, had no substantive involvement in the orders, and there were no changes to the terms of the pre-existing orders. Because of the nature of these arrangements, ACS should not have reported revenue from these arrangements and therefore misreported revenues in its financial reports filed on Form 10-K and Forms 10-Q for these periods*. As a result, ACS falsely reported its internal revenue growth, which Blodgett and Kyser highlighted in earnings releases and analyst conference calls during the period. In addition, ACS's periodic filings with the Commission inadequately or incompletely described these so called "resale transactions." *ACS improperly reported approximately $125 million in revenue due to such arrangements.*

During all relevant periods, Respondents Blodgett and Kyser were, respectively, ACS's chief executive officer and chief financial officer. As such, they were responsible for the content of ACS's filings with the Commission, as well as ACS's earnings releases and analyst conference calls. Blodgett and Kyser received bonuses that were higher than they would have been had ACS correctly applied generally accepted accounting principles (GAAP) with respect to determining the amount of revenue to report from the "resale transactions."

Based on the conduct described below, Respondents were a cause of ACS's violations of the reporting, record-keeping, and internal controls provisions of the Exchange Act. In addition, Blodgett and Kyser violated the Exchange Act's certification requirements relating to ACS's Forms 10-Q for each fiscal quarter from September 30, 2008 through March 31, 2009 and ACS's Form 10-K for the fiscal year ended June 30, 2009.

\*   \*   \*

ACS provided business process outsourcing and information technology services through two reportable operating segments: the Commercial Services Group, which accounted for approximately 60% of ACS's fiscal year 2009 revenues, and the

Government Services Group, which accounted for the remaining 40% of ACS's revenues. ACS historically generated approximately 85% of its revenues from recurring, long-term contracts and 15% from nonrecurring transactions. The "resale transactions" discussed below originated in ACS's Commercial Services Group and were classified as non-recurring revenue.

*See In the Matter of Lynn R. Blodgett and Kevin R. Kyser*, Securities Act Release No. 72938A,

Administrative Proceeding File No. 3-16045 (August 28, 2014).

70.    In regards to ACS' mischaracterization of "resale transactions" to increase revenue,

the Order stated:

In its Form 10-K for the fiscal year ended June 30, 2008, ACS disclosed that its primary goal for fiscal year 2009 was to increase internal revenue growth. In an August 7, 2008 analyst call, Blodgett characterized ACS as "well positioned to accelerate internal revenue growth in fiscal year 2009."

Shortly before the end of its first quarter of fiscal year 2009, ACS noted that the company's revenue would, at current rates, fall short of company guidance and consensus analyst expectations. To increase revenue, ACS arranged for an equipment manufacturer to re-direct through ACS approximately $20 million of pre-existing orders that the manufacturer already had received from another reseller. ACS's transaction documents gave the appearance that ACS was involved in the "resale transactions," but ACS in fact had no such involvement. Among other things, even after ACS was inserted into the "resale transactions," the pricing for equipment remained unchanged, the equipment continued to be shipped from the manufacturer directly to the reseller's customers (i.e., ACS never had actual or constructive possession of it), and the reseller's customers were unaware that ACS was involved. In short, these pre-existing orders between the manufacturer and other reseller proceeded in all material respects according to their original terms and were unaffected by ACS's late insertion.

***ACS executed virtually identical "resale transactions" at the end of the next three quarters. In total, ACS reported revenue of $124.5 million from such arrangements during fiscal 2009.***

*Id.*

71.    With respect to ACS's improper accounting, the Order stated:

ACS improperly applied GAAP in determining the amount of revenue to report in each of its quarters in FY 2009. In making a determination of the amount of revenue to report, ACS did not appropriately take into account all of the critical terms of the arrangement and therefore failed to reflect the lack of economic substance of the

"resale transactions" under GAAP. In addition, ACS's internal controls were insufficient to provide reasonable assurance that ACS reported revenues in conformity with GAAP, primarily because ACS failed to appropriately evaluate the economic substance of the "resale transactions."

The revenue from these "resale transactions" enabled ACS to meet its publicly disclosed internal revenue growth ("IRG") guidance for three of the four quarters for that fiscal year. ACS missed its guidance for its third quarter even with the improperly reported revenue. The table below summarizes the amount of the resale revenue (as reported), ACS's public IRG guidance, IRG (as reported), IRG (as adjusted), and the percent misstated by quarter and for the year:

| Period | "Resale" Revenue (as reported) ($ in millions) | ACS's Public IRG Guidance | IRG (as reported) | IRG (as adjusted) | IRG Over Statement | % Over Statement |
|--------|------|------|------|------|------|------|
| Q1 2009 | $ 19.9 | 5% | 5% | 3.4% | 1.6% | 47% |
| Q2 2009 | $ 40.6 | 4-5% | 4% | 1.2% | 2.8% | 233% |
| Q3 2009 | $ 39.7 | 5-6% | 3% | (0.2)% | 3.2% | 1,600% |
| Q4 2009 | $ 24.2 | 3% | 3% | 1.7% | 1.3% | 76% |
| FY 2009 | $ 124.5 | 5-6% | 3% | 1.5% | 1.5% | 100% |

*Id.*

72.     As far as ACS's failure to properly disclose the "resale transactions" and their

impact on internal revenue growth, the Order stated:

ACS failed to properly disclose the "resale transactions" and their impact on IRG. Even though the "resale transactions" were the largest contributors to ACS's internal revenue growth, ACS did not disclose them in its September 30, 2008 Form 10-Q. In subsequent quarters, ACS disclosed these transactions as "information technology outsourcing related to deliveries of hardware and software." This description did not accurately disclose the nature of these transactions and falsely suggested that they were executed as part of existing ACS outsourcing contracts.

Blodgett and Kyser understood the origination of these "resale transactions" and their impact on ACS's reported revenue growth. However, Blodgett and Kyser did not ensure that ACS adequately described their significance in ACS's public filings and on analyst calls. Blodgett and Kyser certified each of ACS's fiscal year 2009 Forms 10-Q and 10-K.

*Id.*

73.     The Order also discussed how L. Blodgett and Kyser benefitted from this fraud through bonuses they received.  Specifically, the Order stated:

> As part of their compensation, Blodgett and Kyser received bonus payments that were, in part, tied to ACS's financial performance, including revenue growth. As a result of the improperly reported revenue, Blodgett and Kyser received bonuses based on fiscal 2009 performance that were 43% higher than they would have received if ACS had properly applied GAAP with respect to determining the amount of revenue to report from the resale transactions.

*Id.*

74.     Ultimately, the Order found that ACS violated federal securities laws.  The Order further found, that L. Blodgett and Kyser were a cause of ACS' violations and that both, violated federal securities laws individually.  More specifically, the Order stated:

> ACS violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder by filing Forms 8-K, 10-Q, and 10-K for fiscal 2009 that improperly reported revenue related to the resale transactions, materially misstated ACS's internal revenue growth and either inadequately or incompletely described the significance of the resale transactions to internal revenue growth. Blodgett and Kyser were a cause of ACS's violations of these provisions.
>
> ACS violated Section 13(b)(2)(A) by keeping books and records that inaccurately reported ACS's resale transactions during fiscal year 2009. ACS also violated Section 13(b)(2)(B) by failing to devise and maintain a system of internal controls sufficient to provide reasonable assurance that transactions are recorded and financial statements are prepared in accordance with GAAP. Blodgett and Kyser were a cause of ACS's violations of these provisions.
>
> As a result of the conduct described above, Blodgett and Kyser violated Rule 13a-14 under the Exchange Act, which sets forth the requirements for certain reports filed under Section 13(a) of the Exchange Act to include specified certifications by each principal executive and principal financial officer of the issuer.

*Id.*

75.     As per the Order, L. Blodgett and Kyser were also sanctioned.  Specifically, the Order required:

> A. Respondent Blodgett [to] cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B)

of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13a-14 thereunder;

B. Respondent Kyser [to] cease and desist from committing or causing any violations and any future violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13a-14 thereunder;

C. Respondent Blodgett [to], within thirty (30) days of the entry of this Order, pay disgorgement of $351,050 and prejudgment interest of $61,682 to the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. Further, Respondent Blodgett shall, within thirty (30) days of the entry of this Order, pay a civil money penalty in the amount of $52,000 to the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.

D. Respondent Kyser [to], within thirty (30) days of the entry of this Order, pay disgorgement of $133,192 and prejudgment interest of $23,403 to the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. Further, Respondent Kyser shall, within thirty (30) days of the entry of this Order, pay a civil money penalty in the amount of $52,000 to the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.

*Id.*

76.     In response to the Order, Commissioner Aguilar issued a dissenting statement[2] to

the SEC's Order accepting Kyser's offer of settlement. Specifically, Commissioner Aguilar stated:

Accordingly, I respectfully dissent from the Commission's Order accepting the settlement offer of Kevin R. Kyser, a Certified Public Accountant and former Chief Financial Officer ("CFO") of Affiliated Computer Services, Inc. ("ACS" or "Company").

Given the egregious conduct that Mr. Kyser engaged in at ACS, the Commission's settlement, which lacks fraud charges or a timeout in the form of a Rule 102(e) suspension, is a wrist slap at best.

First, let's discuss the improper accounting at issue here. As the Commission's Order states, ACS violated generally accepted accounting principles ("GAAP") by inserting itself into pre-existing sales transactions between a manufacturer and a

---

[2]     *See* Dissenting Statement In the Matter of Lynn R. Blodgett and Kevin R. Kyser, CPA, Respondents (Aug. 28, 2014), *available at* http://www.sec.gov/News/PublicStmt/ Detail/PublicStmt/1370542787855.

reseller for the primary purpose of booking revenues from those transactions. Thus, the Company's involvement in those transactions had no economic substance. ***ACS's misconduct enabled it to improperly report approximately $125 million in revenues, and, crucially, gave the misleading impression that it had met its internal revenue growth guidance. ACS failed to disclose the true nature of these improper transactions, and falsely reported its internal revenue growth in public filings.***

Second, let's discuss how Mr. Kyser, in his critical role as CFO, facilitated ACS's misconduct. As described in the Commission's own Order, Mr. Kyser:

- Understood that ACS had inserted itself into these pre-existing transactions and that they would impact ACS's reported revenue growth;
- Was responsible for the content of ACS's false and misleading public filings with the Commission, earnings releases, and analyst conference calls;
- Highlighted ACS's false and misleading internal revenue growth in earnings releases and analyst conference calls;
- Failed to ensure that ACS adequately disclosed and described the significance of these transactions in ACS's public filings and analyst conference calls;
- Signed false certifications in connection with the Company's periodic filings; and
- Received an inflated bonus based on ACS's financial performance that was overstated by 43%.

Accountants—especially CPAs—serve as gatekeepers in our securities markets. They play an important role in maintaining investor confidence and fostering fair and efficient markets. When they serve as officers of public companies, they take on an even greater responsibility by virtue of holding a position of public trust. To this end, when these accountants engage in fraudulent misconduct, the Commission *must* be willing to charge fraud and *must* not hesitate to suspend the accountant from appearing or practicing before the Commission. This is true regardless of whether the fraudulent misconduct involves *scienter*.

The Commission instead chose to charge Mr. Kyser with limited, narrow non-fraud charges, comprising of violations of the books and records, internal controls, reporting, and certification provisions of the federal securities laws. In the past, respondents with the same state of mind and similar type of misconduct as Mr. Kyser have been charged with violations of the antifraud provisions of the Securities Act, in particular, Sections 17(a)(2) and/or (3), as well as the books and record and internal control violations.

\* \* \*

In my view, Mr. Kyser's egregious misconduct violated, at a minimum, the non-scienter-based antifraud provisions of the Securities Act. Accordingly, charges

under Sections 17(a)(2) and/or (3) are warranted and a Rule 102(e) suspension is necessary and appropriate in this case.

The Commission must send a strong and consistent message to the industry that the Commission takes seriously its responsibility of requiring integrity in the financial markets.  For these reasons, I dissent.

77.      Immediately after acquiring ACS in February 2010, Xerox began to include ACS' revenue figures in its own public filings, thereby misrepresenting its own financial condition.  The elevated financial figures reported were used to suggest that the Company's expanded services and competitive technology, as well as the strength of its business model, were legitimate when, in fact, they were not.

78.      Instead, the Company's positive financial results were based upon its inappropriate recognition of revenue comprised of pre-existing sales transactions between a manufacturer and a reseller, existing for the sole purpose of booking revenues from those transactions in an effort to meet its internal revenue guidance.  Defendants failed to disclose the true nature of these improper transactions, and falsely reported the Company's internal revenue growth in public filings, which materially damaged the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

79.      Plaintiff brings this action derivatively in the right and for the benefit of Xerox to redress the breaches of fiduciary duties and other violations of law undertaken by Defendants.

80.      Plaintiff will adequately and fairly represent the interests of Xerox and its shareholders in enforcing and prosecuting its rights.

81.      In light of the foregoing events, on October 30, 2013, Plaintiff issued the Demand upon the Board to commence an action against certain current and/or former directors and executive officers of the Company.  *See* Exhibit A.

82.     Thereafter, Plaintiff's counsel received a letter, dated November 19, 2013 from Mr. Liu, which informed Plaintiff's counsel that the Demand was received.  In addition, and without citing any provision of New York law, Mr. Liu's letter requested that Plaintiff provide "information and evidence concerning [his] ownership of Xerox stock, including the amount of stock he currently owns and the dates when he acquired such stock."  *See* Exhibit B.

83.     Six months later, Plaintiff's counsel received Mr. Lee's May 14 Letter, which informed Plaintiff's counsel that the Board had purportedly created the DRC and had engaged Levine Lee as counsel to the DRC.  In addition, and again without citing any provision of New York law, Mr. Lee's May 14 Letter requested that Plaintiff provide proof of his Xerox stock ownership.  *See* Exhibit C.

84.     Despite the fact that neither Mr. Liu's nor Mr. Lee's letter cited any New York or other authority in connection with the request for proof of Plaintiff's stock ownership, on June 11, 2014, Plaintiff's counsel nonetheless provided Mr. Lee with the requested account statement.  *See* Exhibit D.

85.     Then, Plaintiff's counsel received Mr. Lee's June 13 Letter, which stated that Plaintiff's stock ownership was insufficient under New York law to pursue a derivative action, and reiterated Defendants' request that Plaintiff's counsel provide them with sufficient documentation to establish Plaintiff's stock ownership during the Relevant Period.  *See* Exhibit E.

86.     Although he was under no legal obligation to do so, Plaintiff's counsel sent Mr. Lee additional requested information on September 8, 2014.  *See* Exhibit F.

87.     Following Mr. Lee's June 13, 2014 Letter, Plaintiff's counsel did not receive the results of the DRC's investigation for ***five months.***  On November 13, 2014, Plaintiff's counsel received the Refusal from Mr. Lee, which stated that the Board created the DRC comprised of

- 28 -

directors Prince and Reese, and, based on its investigation, recommended, and the full board agreed, to reject the Demand in its entirety.  *See* Exhibit G.

88.     Notably, the Refusal identified certain actions taken by the DRC in connection with its purported investigation.

89.     Rather than demonstrating that a comprehensive investigation took place, the plain terms of the Refusal supports the reasonable inference that the investigation of the allegations contained within the Demand was incomplete and that its conclusions regarding the same were not reached in good faith.  Specifically, the Refusal outlines a deficient and unreasonable DRC investigation, which included interviewing employees and directors of the Company, but not a single representative from the SEC, whose investigation of, and findings pertaining to, the Company's accounting practices underlies the Demand and this Action.  Thus, the Refusal, the DRC's findings and the Board's adoption of the same are undeserving of deference.

90.     On December 12, 2014, Plaintiff's counsel wrote an additional letter to Lee, seeking specifics regarding the DRC's investigative process, including details surrounding the witnessed interviewed and documents reviewed.  The December 12, 2014 letter stated in pertinent part:

> Please identify each of the "thirteen current and former directors, officers or employees of the Company and ACS" that the DRC and/or its counsel interviewed. Additionally, please identify each of the "various Xerox and ACS employees" whose interviews were conducted by the U.S. Securities and Exchange Commission (the "SEC"), and whose interview transcripts were reviewed by the DRC and/or its counsel, as well as each of the individuals that made the "Wells Submissions" that were reviewed by the DRC and/or its counsel. Further, please indicate whether the DRC and/or its counsel was unable to interview any witness(es) that it attempted to interview or obtain any SEC interview transcript(s) it sought to review, and if so, please identify such witness(es) and interview transcript(s). Finally, the Refusal does not indicate whether the DRC and/or its counsel ever interviewed any representative(s) of the SEC. Kindly confirm that the DRC and/or its counsel never conducted any such interview(s).

*See* Exhibit H.

91.     In response, Mr. Lee wrote to Plaintiff's counsel on December 30, 2014 stating that Plaintiff's December 12, 2014 letter was referred to Mr. Liu.  *See* Exhibit I.

92.     Having heard nothing for six weeks, Plaintiff's counsel wrote to Mr. Liu on February 24, 2015, again seeking clarification on the DRC's process and specifically stating:

> Having received no substantive response to my December 12 Letter, I presume that you and/or Levine Lee do not intend to respond to my requests for further information. I also presume that the DRC and/or its counsel was able to interview all witnesses that it intended to interview and obtained all SEC interview transcripts that it intended to review, and that the DRC and its counsel never intended to and did not interview any representative(s) of the SEC. If you would care to provide any further information or clarification, I suggest that you do so forthwith.

*See* Exhibit J.

93.     Plaintiff's counsel's February 24, 2015 letter too was completely ignored.  Plaintiff still, seven months later, has not received a response.

94.     Therefore, the instant shareholder derivative action should be allowed to proceed.

**COUNT I**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.     As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Xerox disseminated accurate, truthful and complete information to its shareholders.

97.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Xerox shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other

public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

98.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages.

**COUNT II**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY**
**DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS**

99.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

100.     As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of various problems being experienced with the Company's business practices and operations, exercise good faith in timely undertaking appropriate action to correct the misconduct and prevent its recurrence.

101.     Defendants willfully ignored the obvious and pervasive problems with Xerox's internal controls, and the related practices and procedures, and failed to make a good faith effort to correct these problems or prevent their recurrence.

102.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained material damages.

**COUNT III**
**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

103.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Xerox.

105.    Plaintiff, as a shareholder and representative of Xerox, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Xerox, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing Xerox to misrepresent material facts regarding its financial position and business prospects.

108.    As a direct and proximate result of Defendants' abuse of control, Xerox has sustained significant damages.

109.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

110.    Plaintiff, on behalf of Xerox, has no adequate remedy at law.

## COUNT V
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.    Defendants had a duty to Xerox and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Xerox.

113.    Defendants, by their actions, and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Xerox in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Xerox's affairs, and in the use and preservation of Xerox's assets.

114.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Xerox to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Xerox, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Xerox.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Xerox to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and by taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations, and to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Xerox restitution from Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  September 22, 2015                **HARWOOD FEFFER LLP**


By:   s/ Robert I. Harwood
Robert I. Harwood
Samuel K. Rosen
Daniella Quitt
488 Madison Avenue, 8th Floor
New York, NY 10022
Telephone:  (212) 935-7400
Facsimile:  (212) 753-3630

**THE WEISER LAW FIRM, P.C.**
Robert B. Weiser
Brett D. Stecker
James M. Ficaro
22 Cassatt Avenue
Berwyn, PA 19312
Telephone:  (610) 225-2677
Facsimile:  (610) 408-8062

**RYAN & MANISKAS, LLP**
Katharine Ryan
Richard A. Maniskas
995 Old Eagle School Road, Suite 311
Wayne, PA 19087
Telephone:  (484) 588-5516
Facsimile:  (484) 450-2582

*Attorneys for Plaintiff*