UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
MATTHEW SCIABACUCCHI, derivatively on
behalf of XEROX CORPORATION,

                             Plaintiff,                         15-cv-7506 (PKC)

              -against-                        MEMORANDUM
                                                         <u>AND ORDER</u>

URSULA M. BURNS et al.,

                             Defendants,

and

XEROX CORPORATION

                             Nominal Defendant.

-----------------------------------------------------------x

CASTEL, U.S.D.J.

                Plaintiff Matthew Sciabacucchi brings a derivative action on behalf of nominal

defendant Xerox Corporation ("Xerox") alleging that certain members of Xerox's Board of

Directors (the "Board") and certain executive officers breached their fiduciary duties and were

unjustly enriched during and after the time Xerox acquired Affiliated Computer Services, Inc.

("ACS")—from 2010 until the present.  Sciabacucchi submitted a litigation demand to the

Board, which declined to pursue the claims.  Sciabacucchi contends that the Board's refusal to

pursue legal action arose out of an incomplete investigation into his accusations and was

motivated by bad faith.  All defendants have moved to dismiss Sciabacucchi's complaint

pursuant to Rules 12(b)(6) and 23.1(b)(3), Fed. R. Civ. P.  Because the complaint does not

plausibly allege that the Board refused Sciabacucchi's litigation demand in violation of the New

York business judgment rule, it is dismissed.  For that reason, the Court does not reach

defendants' alternative argument for dismissal: that Sciabacucchi's complaint designates as defendants certain individuals who had no affiliation with Xerox at the time of the alleged wrongdoings.

Defendants' motion to dismiss is granted and the Sciabacucchi derivative action is dismissed.

BACKGROUND.

For the purposes of defendants' motion, all non-conclusory factual allegations asserted in the Verified Shareholder Derivative Amended Complaint (the "Complaint" or "AC") are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of the plaintiff as the non-movant, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).  The following facts are based on the Complaint and the exhibits attached thereto.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

I.    The Parties and Subject Matter Jurisdiction:

Plaintiff Matthew Sciabacucchi is a current shareholder of Xerox and has been a shareholder since December 2003.  (AC ¶ 30).  He is a citizen of the State of Pennsylvania, (AC ¶ 30), and invokes this Court's jurisdiction by reason of diversity of citizenship, 28 U.S.C. § 1332.

Nominal Defendant Xerox is a "global leader in business process and document management solutions."  (AC ¶ 2).  It is a New York corporation with its headquarters in Connecticut.  (AC ¶ 31).

Individual Defendants Ursula Burns, Charles Prince III, Richard Harrington, Ann Reese, William Hunter, Sara Tucker, Robert Keegan, Mary Wilderotter, Stephen Rusckowski,

Nicholas Nicholas Jr., Robert McDonald, Lynn Blodgett, Luca Maestri, Gary Kabureck, James Firestone, Kathryn Mikells, Thomas Blodgett, David Amoriell, Michael Festa, Joseph Mancini Jr., and Leslie Varon are, or were, members of the Board or executive officers at Xerox.  (AC ¶¶ 32-51, 53).  Individual Defendant Kevin Kyser was the former CFO of ACS and was employed at Xerox from January 2011 through May 2013.  (AC ¶ 52).  No individual defendant is a citizen of the State of Pennsylvania.  (AC ¶¶ 32-53).  Because there is complete diversity of citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs, this Court has subject matter jurisdiction.  28 U.S.C. § 1332(a)(2).

II.     *The Acquisition of ACS and the SEC Investigation:*

In February 2010, Xerox acquired ACS, an information technology and business services company, for $6.4 billion.  (AC ¶ 3).  At some point prior to October 2013, ACS came under investigation from the Securities and Exchange Commission (the "SEC") regarding certain accounting practices at the firm.  (AC ¶¶ 3-5).  On October 8, 2013, Xerox filed a Form 8-K, disclosing that the SEC was conducting such an investigation.  (AC ¶ 4).  The focus of the SEC investigation was "whether revenue associated with certain ACS equipment resale transactions, primarily in the period prior to Xerox's acquisition of ACS, should have been presented on a net rather than gross basis."  (AC ¶ 5).  More specifically, the SEC alleged that, in 2009, ACS, in response to an impending revenue shortfall, arranged for "an equipment manufacturer to re-direct through ACS pre-existing orders that the manufacture[r] already had received," which "gave the appearance that ACS was involved in resale transactions" when it was, in actuality, not involved.  (AC ¶ 6).  ACS then reported $124.5 million in fiscal year 2009 revenue on the basis of those resale transactions.  (AC ¶ 6).

On August 28, 2014, the SEC issued an Order stating that it was instituting cease-and-desist proceedings against Lynn Blodgett, who was President and Chief Executive Officer ("CEO") at ACS before he became Executive Vice President of Xerox and President of Xerox Services, and Kevin Kyser, who was ACS's former Chief Financial Officer ("CFO").  (AC ¶¶ 5, 7).  In anticipation of those proceedings, Lynn Blodgett and Kevin Kyser agreed to a settlement with the SEC whereby they paid a monetary penalty.  (AC ¶ 7).  SEC Commissioner Aguilar issued a dissent to the SEC's Order accepting Kyser's settlement, asserting that "Mr. Kyser's egregious misconduct violated, at a minimum, the non-scienter-based antifraud provisions of the Securities Act."  (AC ¶ 80).  Commissioner Aguilar also stated that the settlement was a "slap on the wrist" and that "charges under Sections 17(a)(2) and/or (3) [were] warranted and a Rule 102(e) suspension [was] necessary and appropriate in this case."  (AC ¶ 80).

According to Sciabacucchi, from 2010 until the time he filed this lawsuit, the individual defendants made false and misleading statements regarding the financial impact of Xerox's acquisition of ACS.  (AC ¶ 8).  They also breached their fiduciary duties of loyalty and good faith in connection with their management of Xerox.  (AC ¶ 9).  For example, Xerox permitted Lynn Blodgett "to retire effective December 31, 2014 and retain lucrative post-retirement benefits at the expense of Xerox."  (AC ¶ 7).  Sciabacucchi also alleges that the individual defendants should have discovered ACS's accounting impropriety prior to acquiring the firm.  (AC ¶¶ 9-10).  Their failure to do so caused Xerox to pay an inflated price for ACS.  (AC ¶ 10).  For those reasons, Sciabacucchi contends that the individual defendants' actions "significantly damaged" Xerox.

III.      *Sciabacucchi's Pre-Suit Demand and the Board's Investigation and Refusal:*

On October 30, 2013, Sciabacucchi sent a letter to the Board alleging that the individual defendants breached their fiduciary duties of loyalty and good faith.  (AC ¶ 12; Ex. A).  He also requested that the Board undertake an investigation into the alleged breaches and commence a legal action against certain members of the Board and executive officers "to recover for the benefit of the Company the amount of damages sustained by the Company as a result of Management's breaches of fiduciary duties . . . ."  ("October 30, 2013 Letter from Sciabacucchi to the Board" (AC Ex. A)).  On November 19, 2013, Sciabacucchi received a letter from Don Liu, the General Counsel of Xerox, confirming that the Board received his shareholder demand.  (AC ¶ 13; Ex. B).

Shortly after receiving Sciabacucchi's demand letter, the Board adopted a resolution forming the Demand Review Committee (the "DRC") to "consider and investigate the Demand Letter's allegations, and to make recommendations to the full Board of Directors regarding how to respond to that letter."  ("November 14, 2014 Letter from Levine Lee to Sciabacucchi" (Ex. G)).  The Board then appointed two independent directors to the DRC: Charles Prince, former CEO and Chairman of Citigoup, Inc., and Ann Reese, the Executive Director of the Center for Adoption Policy and former CFO of ITT Corporation.  (Ex. G).  The DRC retained Levine Lee LLP ("Levine Lee") as independent counsel to "assist it in evaluating and investigating the claims made in" Sciabacucchi's demand letter.  (Ex. G).

Over the next nine months, the DRC, assisted by Levine Lee, conducted an investigation into Sciabacucchi's allegations.  (Ex. G).  According to Levine Lee's November 13, 2014 Letter to Sciabacucchi, Levine Lee, on behalf of and in concert with the DRC, "reviewed the results of the Company's internal investigation into the issues raised by the SEC's

investigation" and "examined whether, as alleged by [Sciabacucchi], Management breached its fiduciary duty to the Company." (Ex. G). They reviewed "thousands of pages of materials relating to the SEC investigation [and] the Company's investigation" as well as "transcripts of SEC interviews with various Xerox and ACS employees and Wells Submissions on behalf of individuals who received Wells notices." (Ex. G). They met with Xerox's counsel several times "to discuss the Company's internal investigation" and "spoke to counsel for the individuals who received Wells notices." (Ex. G). They also "interviewed thirteen current and former directors, officers or employees of the Company and ACS as well as the Company's outside[] auditor, PricewaterhouseCoopers." (Ex. G).

       The DRC was, according to the November 14 Letter, "closely involved in all aspects of the investigation, including participating in the interviews conducted; holding regularly scheduled meetings with Levine Lee to discuss and direct the progress and scope of the investigation; and reviewing documents." (Ex. G). On September 19, 2014, the DRC held a conference call with Levine Lee to review the progress of the investigation during which Levine Lee presented the DRC's fact-finding and preliminary conclusions and fielded questions from the DRC. (Ex. G). The DRC and Levine Lee then met once more in September 2014 and several times in October 2014, each time reviewing the preliminary findings of the investigation and engaging in substantive discussion on whether a basis existed for litigation against any current and former officer, director or employee of Xerox as well as on whether litigation was in Xerox's best interest. (Ex. G). Ultimately, the DRC concluded that there was no basis for the allegations in Sciabacucchi's demand letter and that litigation was not in the best interest of Xerox. (Ex. G).

On October 9, 2014, the DRC reported its findings and conclusion to the Board. (Ex. G).  It recommended that the Board deny Sciabacucchi's demand.  (Ex. G).  On October 15, 2014, at a regularly scheduled Board meeting, the DRC formally presented an overview of its investigation to the Board and gave the Board an opportunity to ask questions.  (Ex. G).  At that same meeting, the Board unanimously adopted the DRC's findings and conclusions and rejected Sciabacucchi's demand that Xerox commence litigation against members of the Board and executive officers of Xerox.  (Ex. G).

IV.    *Sciabacucchi's Response to Xerox's Refusal:*

On November 13, 2014, Levine Lee wrote to Sciabacucchi describing the procedures Xerox employed to investigate his demand and informing him that the Board had unanimously agreed to reject his demand.  (AC ¶ 18).   In response, Sciabacucchi wrote to Levine Lee asking for "specifics regarding the DRC's investigative process, including details surrounding the witnesse[s] interviewed and documents reviewed."  (AC ¶ 20).  Specifically, Sciabacucchi requested that the Board:

> Please identify each of the "thirteen current and former directors, officers or employees of the Company and ACS" that the DRC and/or its counsel interviewed.  Additionally, please identify each of the "various Xerox and ACS employees" whose interviews were conducted by the U.S. Securities and Exchange Commission [], and whose interview transcripts were reviewed by the DRC and/or its counsel, as well as each of the individuals that made the "Wells Submissions" that were reviewed by the DRC and/or its counsel. Further, please indicate whether the DRC and/or its counsel was unable to interview any witness(es) that it attempted to interview or obtain any SEC interview transcript(s) it sought to review, and if so, please identify such witness(es) and interview transcript(s). Finally, the Refusal does not indicate whether the DRC and/or its counsel ever interviewed any representative(s) of the SEC.  Kindly confirm that the DRC and/or its counsel never conducted any such interview(s).

("December 12, 2014 Letter from Sciabacucchi to Levine Lee" (AC ¶ 20, Ex. H)).  Levine Lee did not respond to Sciabacucchi's letter, but instead referred the letter to Liu, Xerox's General Counsel.  (AC ¶ 21).

Sciabacucchi received no response to his December 12 letter.  (AC ¶ 22).  After six weeks of waiting, Sciabacucchi sent a letter to Liu, repeating his same request for clarification.  (AC ¶ 22).  On February 25, 2015, Liu responded, writing that "[i]n light of the information contained in [Levine Lee's] November Letter – and the Board's decision to reject your client's demand after a thorough process – we see no basis upon which to provide you with further information, other than to represent that the DRC and the Board were satisfied that they had access to all the factual materials they needed to fully and carefully evaluate Mr. Sciabacucchi's allegations." ("February 25, 2015 Letter from Counsel for Xerox to Sciabacucchi" (AC Ex. K)).

Sciabacucchi now contends that the Board's unwillingness to provide any further information regarding its investigation "leads to the plausible inference" that the DRC did not "even attempt to interview a single individual from outside Xerox or ACS."  (AC ¶ 24).  And, that the DRC's failure to interview any representative of the SEC renders its investigation "incomplete and supports the reasonable inference that its conclusions, and the defendants' subsequent endorsement of the same, were not reached in good faith."  (AC ¶ 25).

DISCUSSION.

I.    *Legal Standard on a Motion to Dismiss:*

Pursuant to Rule 12(b)(6), Fed. R. Civ. P., to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  The Court must examine only the well-pleaded factual allegations, ignoring any legal conclusions, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Commc'ns, Inc., 493 F.3d at 98.

II.     Derivative Actions and the Requirement of a Pre-Suit Demand:

"The derivative form of action permits an individual shareholder to bring suit to enforce a corporate cause of action against officers, directors, and third parties."  Espinoza ex rel. JPMorgan Chase & Co. v. Dimon, 797 F.3d 229, 233 (2d Cir. 2015) (quoting Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991)) (internal quotation marks omitted).  "Devised as a suit in equity, the purpose of the derivative action [is] to place in the hands of the individual shareholder a [] means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers."  Id. at 233-34 (internal quotation marks omitted).  "Concerned about the potential for abuse of the remedy, however, equity courts established as a precondition for the suit that the shareholder demonstrate that the corporation itself had refused to proceed after suitable demand, unless excused by extraordinary conditions."  Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 138 (2d Cir. 2004) (quoting Kamen, 500 U.S. at 95–96) (internal quotation marks omitted).

"Accordingly, Rule 23.1 of the Federal Rules of Civil Procedure requires a complaint in a derivative action to 'state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the

shareholders or members; and . . . the reasons for not obtaining the action or not making the effort.'" Espinoza, 797 F.3d at 234 (quoting Fed. R. Civ. P. 23.1(b)(3)) (alterations in original). While Rule 23.1 "creates a federal standard as to the specificity of facts alleged with regard to efforts made to urge a corporation's directors to bring the action in question," state law will determine "the adequacy of those efforts." RCM Sec. Fund, Inc. v. Stanton, 928 F.2d 1318, 1330 (2d Cir. 1991).

       To determine what state law applies, a federal court sitting in diversity employs the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). "Under New York law, courts look to the law of the state of incorporation in adjudicating a corporation's internal affairs." NAF Holdings, LLC v. Li & Fung (Trading) Ltd., 772 F.3d 740, 743 n.2 (2d Cir. 2014) (internal quotation marks omitted). Because Xerox is a New York corporation, the Court will apply New York law to all substantive issues presented in this action. See Lerner ex rel. General Elec. Co. v. Immelt, 523 Fed. App'x. 824, 826 (2d Cir. 2013) ("GE is incorporated in New York State, and New York law governs its internal affairs, including when and how a shareholder must make a demand on the board of directors before bringing a derivative action.").

       There is no doubt that Sciabacucchi made a litigation demand on the Board as required by New York law. The only question is whether the Complaint adequately alleges that the Board wrongfully refused his demand. Sciabacucchi asserts that the Board did and the defendants disagree. To answer that question, the Court must determine, based on the allegations in the Complaint, whether the Board's refusal is protected from judicial review by New York's business judgment rule.

III.     *The Business Judgment Rule under New York Law:*

The business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." Auerbach v. Bennett, 47 N.Y.2d 619, 629 (1979).  It is "grounded in the prudent recognition that courts are ill equipped and infrequently called on to evaluate what are and must be essentially business judgments." Id. at 630.  "[A]bsent evidence of bad faith or fraud," courts must respect the business decisions of corporate boards.  Id. at 631.

Even though a shareholder is permitted "to bring suit to enforce a corporate cause of action," Kamen, 500 U.S. at 95 (internal quotation marks omitted), "the decision whether and to what extent to explore and prosecute such claims [ultimately] lies within the judgment and control of the corporation's board of directors," Auerbach, 47 N.Y.2d at 631.  When evaluating a board's refusal to bring litigation after it was demanded by a shareholder, "the substantive aspects" of a board's decision are "beyond judicial inquiry under the business judgment doctrine." Id. at 623.  However, a court "may inquire as to the disinterested independence of the members of [the committee appointed by the board to assess the shareholder demand] and as to the appropriateness and sufficiency of the investigative procedures chosen and pursued by the committee." Id. at 623-24.  Ultimately, a board's refusal of a shareholder demand is presumed valid under the business judgment rule unless the members of the investigating committee do not possess a "disinterested independence," id. at 631, or "the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham," id. at 634.

Sciabacucchi does not plausibly allege that the members of the DRC or the Board were self-interested.  "The test for self-interestedness is *not* whether a director or someone

who controls him has engaged in or is liable for some sort of misconduct . . . ."  Stein v. Immelt, 472 F. App'x 64, 66 (2d Cir. 2012) (emphasis added).  Allegations that the directors were "personally implicated in the misconduct alleged in the demand letter and were named as defendants in other lawsuits arising out of the same alleged misconduct" are not adequate to overcome the business judgment rule.  Lerner, 553 Fed. App'x. at 827.  Instead, plaintiffs arguing that directors are "self-interested" must allege that the directors would "receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally."  Marx v. Akers, 88 N.Y.2d 189, 202 (1996).  There are no allegations in the Complaint relating to any financial interest held by any of the members of the Board that would support the plausible inference that they were self-interested with respect to Sciabacucchi's demand.  The fact that Sciabacucchi names all members of the Board in his Complaint and alleges that they were involved in the underlying breach of fiduciary duty, without more, does not support a plausible inference that the Board was self-interested.

Instead, Sciabacucchi alleges that the Board's refusal was wrongful because the DRC undertook an inadequate investigation into his allegations of corporate wrongdoing and because the Board's adoption of the DRC's recommendation to reject litigation was not made in good faith.  The substantive decision of the Board "falls squarely within the embrace of the business judgment doctrine, involving as it did the weighing and balancing of legal, ethical, commercial, promotional, public relations, fiscal and other factors familiar to the resolution of many if not most corporate problems."  Auerbach, 47 N.Y.2d at 634.  However, the "methodologies and procedures" used by the DRC to investigate Sciabacucchi's allegations are properly the subject of judicial review.  Id.  The DRC and the Board "may reasonably be required to show that they have pursued their chosen investigative methods in good faith."  Id.

And, they "may be expected to show that the areas and subjects to be examined are reasonably complete." Id.  Ultimately, the DRC's investigation will shield the Board's refusal to sue from judicial interference unless "the investigation has been so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham." Id.

        Based on the facts alleged in the Complaint and the exhibits attached thereto, the Board's investigation of Sciabacucchi's demand was more than procedurally adequate.  First, shortly after receiving Sciabacucchi's demand letter, the Board adopted a resolution forming the DRC—the Demand Review Committee—to "consider and investigate the Demand Letter's allegations, and to make recommendations to the full Board of Directors regarding how to respond to that letter." (Ex. G).  The Board then appointed two qualified independent directors to run the DRC: Charles Prince, former CEO and Chairman of Citigoup, Inc., and Ann Reese, the Executive Director of the Center for Adoption Policy and former CFO of ITT Corporation. (Ex. G).  Even though the DRC did not have the power to initiate or refuse litigation on its own, but only the power to make recommendations to the Board, such an "evaluative committee" is generally considered procedurally sound.  See Kenney v. Immelt, 2013 WL 5976625, at 16* (N.Y. Sup. Ct. Nov. 7, 2013) (noting that an "Audit Committee" undertook the investigation into shareholder demand and recommended that the Board refuse the demand); Stoner v. Walsh, 772 F. Supp. 790, 800 (S.D.N.Y. 1991) (noting that "the Equitable Board appointed a committee with the power only to recommend acceptance or rejection of demand").

        Second, the DRC retained independent outside counsel—Levine Lee—to assist the DRC in its investigation.  (Ex. G).  Sciabacucchi does not allege that Levine Lee was too inexperienced or unqualified to undertake its assignment.  Indeed, the facts set forth in the Complaint demonstrate nothing other than that Levine Lee was conscientious in its work.

"Committees investigating shareholder demands routinely retain independent counsel to assist them with their investigation, and such retention has been found to be an adequate and appropriate procedure." <u>Kenney</u>, 2013 WL 5976625, at 16*; <u>see also</u> <u>Auerbach</u>, 47 N.Y.2d at 635 (finding that "committee promptly engaged eminent special counsel to guide its deliberations and to advise it"); <u>Stoner</u>, 772 F. Supp. at 793 (noting that "the Committee had retained the law firm of White & Case as independent counsel to the Committee and the entire Board with respect to the matters referred to in the demand").

       Third, the procedures utilized by the DRC and Levine Lee during its nine month investigation "show that the areas and subjects [] examined [were] reasonably complete" regarding the Board's alleged mismanagement of the ACS acquisition. <u>Auerbach</u>, 47 N.Y.2d at 634. The DRC and Levine Lee "reviewed the results of the Company's internal investigation into the issues raised by the SEC's investigation" of ACS. (Ex. G). They reviewed "thousands of pages of materials relating to the SEC investigation [and] the Company's investigation" as well as "transcripts of SEC interviews with various Xerox and ACS employees and Wells Submissions on behalf of individuals who received Wells notices." (Ex. G). They met with Xerox's counsel several times "to discuss the Company's internal investigation" and "spoke to counsel for the individuals who received Wells notices." (Ex. G). They also "interviewed thirteen current and former directors, officers or employees of the Company and ACS as well as the Company's outside[] auditor, PricewaterhouseCoopers." (Ex. G). Sciabacucchi does not allege any fact that casts doubt on whether Xerox actually undertook any of the procedures listed above, which Levine Lee described to Sciabacucchi in its letter informing him the Board had refused his demand. (<u>See</u> Ex. G).

Rather, Sciabacucchi takes issue with the fact that the DRC did not "attempt to interview a single individual from outside Xerox or ACS," specifically any representative of the SEC.  (AC ¶¶ 24-25).  This, according to Sciabacucchi, rendered the DRC's investigation "incomplete and supports the reasonable inference that its conclusions, and the defendants' subsequent endorsement of the same, were not reached in good faith."  (AC ¶ 25).  As an initial matter, the DRC and Levine Lee did interview individuals from outside of Xerox and ACS: they interviewed employees at PricewaterhouseCoopers, Xerox's outside auditor.  (Ex. G).  Even still, New York law does not require a board or its investigating committee to interview specific witnesses or categories of witnesses during its demand investigation.  The only requirement regarding the scope of an investigation is the one quoted above: "that the areas and subjects to be examined are reasonably complete."  Auerbach, 47 N.Y.2d at 634.

There is no reasonable basis to infer that the DRC would have obtained a more complete understanding of the facts and circumstances underlying the shareholder demand if they interviewed any of the SEC employees who worked on the ACS investigation.  The DRC and Levine Lee had already reviewed thousands of pages of materials from the SEC investigation, including transcripts from the SEC's interviews with Xerox and ACS employees and Wells Submissions.  They also spoke with counsel for the individuals who received Wells notices from the SEC.  (Ex. G); see Struogo v. Bassini, 112 F. Supp. 2d 355, 365-66 (S.D.N.Y. 2000) (holding that it was not necessary to interview external witness from company that was considered but rejected as deal managers for the Rights Offering at issue because the committee "reviewed substantial documentation [that company] originally provided to the Board regarding the proposed Rights Offering").  Nevertheless, Sciabacucchi insists that the DRC should have at least interviewed Commissioner Aguilar, who penned a dissent to Kevin Kyser's settlement with

the SEC arguing that Kyser's settlement terms were far too lenient.  (AC ¶ 80).  However, Sciabacucchi does not allege that the DRC failed to review the substance of Commissioner Aguilar's dissent or that an interview with Commissioner Aguilar would have provided any useful information beyond that contained in his dissent or in any of the other SEC documents. Nor is it reasonable to infer that a publicly dissenting Commissioner would have withheld critically important information from his statement, especially where that information might otherwise have strengthened his dissenting position.

        In addition, Sciabacucchi points to two cases from the Northern District of California and the Western District of Washington that he contends support his position that the DRC's failure to interview someone outside of Xerox or ACS makes its demand investigation inadequate.  Neither case is applicable.  The court in City of Orlando Police Pension Fund v. Page, 970 F. Supp. 2d 1022, 1032 (N.D. Cal. 2013), did hold that "any reasonable investigation" should have included an interview with the Department of Justice's (the "DOJ") lead investigator, or someone with comparable knowledge of the DOJ investigation.  However, the factual circumstances in Page make that court's holding inapplicable here.  Most importantly, Google, the nominal defendant in Page, had entered into a non-prosecution agreement with the DOJ in which it accepted responsibility for violating the law and paid the federal government a $500 million fine.  970 F. Supp. 2d at 1024.  Thereafter, in its response to the shareholder litigation demand, Google's board of directors stated that the committee investigating the demand had found "no wrongdoing or culpability by Google Directors or officers."  Id. at 1031. The court in Page held that the board's "sweeping conclusion that 'no wrongdoing or culpability occurred,' when coupled with the [non-prosecution agreement's] express 'acceptance of responsibility,' does create reasonable doubt that the investigation was conducted reasonably and

- 16 -

in good faith."  Id.  The overall context of the demand presented to the Google board and the apparently superficial response to the shareholder demand are in contrast to the actions of the Board and its DRC.

Similarly, the court in Barovic v. Ballmer, 72 F. Supp. 3d 1210, 1215-16 (W.D. Wash. 2014), held that the demand review committee's "failure to even attempt to speak with any individual who participated in that [European Commission] investigation does raise questions about the diligence with which the DRC pursued its investigation."  However, the factual circumstances in Ballmer are also distinguishable.  In Ballmer, Microsoft, the nominal defendant, had entered into a settlement agreement with the European Union in which it was responsible for monitoring its own compliance.  72 F. Supp. 3d at 1213.  Thereafter, Microsoft failed to comply with the terms of the agreement leading the EU to fine the company $732.2 million.  Id.  Because it was plausible that a member of the European Commission "could reasonably have been expected to hold highly material information on topics such as the EU's expectations of Microsoft's internal compliance methodology," the demand review committee's failure to interview an official from the European Commission was an understandably critical flaw.  Id. at 1215-16.

Here, the SEC fined two officers of ACS.  (AC ¶¶ 5-7).  Xerox itself did not suffer any regulatory penalty, nor did any member of the Board.  Put simply, no circumstances alleged in the Complaint lead the Court to believe that the DRC or the Board ignored important areas of information in order to mispresent the directors' and officers' culpability, unlike the circumstances in Page and Ballmer.  If analyzed under New York law, Page and Ballmer are best understood as cases where the factual circumstances presented, namely occasions where the company itself was liable for misconduct and/or responded superficially or misleadingly to a

demand letter, required a board to engage in a wider investigation to ensure that "the areas and subjects to be examined are reasonably complete." Auerbach, 47 N.Y.2d at 634. Here, there is no reasonable basis to infer that the DRC's failure to interview any member of the SEC caused the DRC to overlook important information about the alleged wrongdoing of the Board.

Moreover, Sciabacucchi's argument that the DRC's recommendation of refusal and the Board's adoption of that recommendation were made in bad faith are contradicted by the facts alleged in and attached to the Complaint. The DRC was "closely involved in all aspects of the investigation, including participating in the interviews conducted; holding regularly scheduled meetings with Levine Lee to discuss and direct the progress and scope of the investigation; and reviewing documents." (Ex. G). The DRC met with Levine Lee at least six times to review the fact-finding and preliminary conclusions before presenting them to the Board. (Ex. G). Then, the DRC presented the Board with its findings and conclusions twice, once fielding questions from the Board, before the Board voted to adopt the findings and refuse the demand. (Ex. G.) Levine Lee reached out to Sciabacucchi to acquire "any information [he had] concerning alleged breaches of fiduciary duties of loyalty, good faith, or due care by Xerox officers and directors that [he] did not set forth in [his] October letter . . . ." (Ex. C). Thus, in contrast to his "bad faith" argument, Sciabacucchi's Complaint alleges that the DRC and the Board were actively and conscientiously engaged in investigating the shareholder demand.

In sum, Sciabacucchi fails to allege any basis for inferring that the defendants' investigation was "so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or sham." Auerbach, 47 N.Y.2d at 634. Instead, all of the facts alleged in the Complaint and included in the exhibits attached to the Complaint lead the Court to conclude that the Board's demand refusal was not wrongful. For that reason, the

Board's decision is shielded from judicial scrutiny by New York's business judgment rule and

Sciabacucchi's derivative action must be dismissed.

CONCLUSION.

    Defendants' motion to dismiss is GRANTED. (Dkt. 40).  The Clerk is directed

to enter final judgment for the defendants and close the case.

    SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       July 29, 2016